We'll hear the next case, United States v. De Silva and Houghton. May it please the Court, my name is Alan Nelson and I represent the appellant O'Neill De Silva. We submit that the district court in conducting the Rule 11 plea proceedings committed plain error. This court has adopted a strict adherence standard to evaluate the acceptance of a guilty plea pursuant to Rule 11, requiring a critical examination of even slight deficiencies in the proceedings. Here, the district court erred in two material manners. First, it failed to make a full and complete inquiry into appellant's mental status. And second, the court failed to advise appellant that the sentencing guidelines were advisory, that in imposing sentence, the court was required to review the factors articulated in 3553. And most significantly, it had the power to following a review of those factors to vary above the advisory guideline range. The circumstances of the plea here- Can I ask you to, looking at the record, it seems to me that the district court did what you say the district court didn't do. Actually, it did not. The district court inquired about the mental facilities, about the medications, asked specifically whether your client understood what was going on. He said he did. His counsel raised no objection. Isn't that a problem? Well, actually, the problem here is the unique nature of the proceedings. The proceedings commenced with either this was going to be substitution of counsel or setting a trial date. But yet, in the middle of the proceedings, or rather quickly into it, two pages into the plea proceedings, to the surprise of all in the courtroom, the defendant elected to accept the plea offer that was being made. So it was an unusual circumstance to begin with. Second, with respect to my client's mental state, this was an unusual situation because Mr. DeSilver came into the courtroom in a wheelchair. He was non-ambulatory. He was taking both antidepressant and anti-anxiety medication, as well as significant medication for purposes of the pain he was experiencing from the injuries to his spine. The court asked, and this is in the appendix. And the full discussion is 65 to 67. The court asked counsel, let me just ask either counsel, if you have any doubts as to Mr. DeSilver's competency to plead at this time. The government, no, your honor. Defense counsel, no, your honor. The court goes into an extended discussion with the defendant about his medication uses. When you take this medication, does it affect your ability to understand what's going on around you? The defendant, sometimes yes. How about right now? Not right now, the defendant says. The court, you're able to communicate with your lawyer even when you're on the medication? Yes, ma'am. Well, I believe the response to that, your honor, is clear. First, counsel stated at page A66 of the appendix that he did not know the type, dosage, or full panoply of medication Mr. DeSilver received. He couldn't tell the court what it was. The court didn't know what it was. His client with an IQ that was diagnosed by Dr. Drobe as being borderline level 76 and being diagnosed with both anxiety disorder, emotional disorder, inability to be able to concurrently speak at the appropriate time. These were the kind of things that to rely upon what the attorney not knowing what the medication was, or the court being in a position to know what was taking place with a person who was objectively ill, and who had a prior existing anxiety and depression issue, mandated that there be a much further inquiry, particularly under the unique circumstances here, of where the individual comes into the courtroom in a wheelchair about to seek new counsel, and instead decides in the middle of the proceedings that he wants to enter a guilty plea, resulting in an adjournment so counsel could speak to him further about whether that's in fact what he wishes to do. The court was on notice at that point to really make a detailed inquiry, and it actually didn't. It relied upon the defendant's statements and the counsel's statements, which were just based on his objective observations. Mr. Nelson, when did you enter this case? I entered the case subsequent to, I believe it was in August of this past year. Meaning where in the timeline? I was substituted to CJA counsel after the defendant indicated that he no longer had confidence in his district court counsel. And that's when I reviewed the record concerning the events that took place. What is it that you want from us? That is, what's the decree that, if you could fashion it yourself, that we should enter? We're asking the court to enter an order in this case reversing or vacating the conviction in the case, and remanding the matter for further proceedings. He could then make an intelligent decision, because Mr. DeSilva now is in Denver's, he's receiving extensive treatment, both psychologically and physically, that would place him in a position to be able to make a complete and informed election as to what he would like to do. At what point did he raise this, the issue that his plea was improper or involuntary? After the application was, I would say it was approximately two weeks after the sentence was imposed by the court. Counsel met with the defendant in the MCC before he was designated. And at that time, he indicated he no longer had confidence in counsel, and he wanted new counsel to be able to handle the appeal of the matter. Which is, in this particular instance, significant because just- You received a sentence that was above the guidelines, correct? Yes, yes. And that was a surprise to him? Yes, in fact, it's rather unique here because the guidelines here weren't really guidelines. It was a set sentence of 120 months. As a result of that, there was an unusual circumstance, and particularly if you look at the record, in that the parties all agreed that nobody would move for either a departure or an upward or a downward variance. In addition, counsel had advised- That was done sui sponte by the court. Yes. And didn't the district court say on a number of occasions that it would not be bound? Actually, a close review of the record indicates what the district court continues to speak in terms of is the guideline determination. It does not discuss in any detail the fact that the 3553 factors have to be reviewed. It does not discuss in detail that it has the power after reviewing them. I understood that the court said that it would determine the appropriate sentence and that the sentence could be different from what the parties had thought it might be. Absolutely, Your Honor, but however, it's stated in the context of an evaluation of the guidelines, not in the context of a discussion as to whether or not the court's sui sponte would be able to vary upward up to what the maximum potential sentence would be. What was the period after the conviction between the conviction and the sentencing? I believe it was five months, and that's as a result of- During that five months, of course, he could have tried to have his plea changed or moved to have his plea vacated. The vast majority of that time- He didn't do that. He waited until he was sentenced, and he got the 180 months. That's correct. Above the guideline range of 120 months, which was, I think it's been pointed out here that he was advised enough about that to be able to, so that the court was not acting in any way inappropriately by imposing a sentence of 180 months. You look a little skeptically at an effort to overturn a guilty plea after sentence under these circumstances? Well, I'm well aware of the fact that there was a significant period of time that elapsed between the plea and the sentence. Certainly, the appellant here, given his mental state and physical condition, was not reviewing the minutes of the proceeding to determine whether or not it was effectively done. More significantly, he had been advised by his counsel, the guidelines are going to be 120 months. Everybody understands it's 120 months. Nobody's moving for an upward or downward variance here. The probation department recommended a 120 month sentence, so the only document he had actually seen in between was the PSR in the case. So he had no reason to think in any other terms, absent- He was comfortable with everything, and he got a sentence of 120 months. Absent the court having advised him of the fact that the time that the plea was entered, that the guidelines were only advisory, that the court was required to review the 3553 factors, and that it had the ability and the power to vary upward. That was never stated to him. And but for the fact that those things were not stated to him at the time of the plea- He woke up after he received the sentence, that's when he said, wait a minute, my plea was improper, and prior to that, there was no concern. Well, at that time, he no longer expressed confidence in his counsel and requested new counsel, and at that time, the review was conducted of the plea. No doubt that he was upset. And in fact, he relied on his plea, did he not, in his sentencing submission, as evidence of his remorse and maturity. He did, in fact- That was submitted months after the plea was entered. And that was as a result of the fact that counsel thought it was very important for the court to be able to see the report of Dr. Drobe, the forensic psychiatrist, which reflected the fact that the appellant had a 76 IQ and had significant psychological issues for the court to consider, which are factors that certainly should have been taken into account at the time the plea itself came into play. My final argument being in substance and summary, that in looking at plain error review, there is a clear error here if you look closely at the requirements that this court has imposed under Laura for a very strict scrutiny of what takes place in district court. And that's not done in a vacuum. It's not just done on the record. It's who's coming into court, what's taking place. Every single plea is unique in and of itself. Every single one is sua sponte. And that's the reason why, and it was sui generis rather, and that's why in every single one of the proceedings, the court is required to follow very strictly the rules under Rule 11. And here, very simply, the court did not do so. It seems to me, reviewing this transcript, that Judge Nathan probably has a so-called checklist. By now, just about every district judge in the country has a checklist of things to raise in a change of plea proceeding. What is it that she didn't have on her checklist? What should she have added? What is it that you would want her to do if we send this case back to her? I would say in the approximate 20 years, 30 years now that I've been on the CJA panel and probably taken about, since post-Booker, 200 pleas. A portion of the colloquy that she did not include, that I think should be included at all times, are the three things that I raised. One, that the guidelines are not mandatory. Two, I must review the 3553 factors, and they are one through six and where they fall into play. And I have the power to vary upwardly or downwardly based upon that. Those are the three things. And none of those three items or matters were part of this record at any time? Completely devoid. While the government is certainly going to get up and say it's in the plea agreement, given the nature of the individual that's involved here. Kind of important, isn't it? Well, it's important. However, we don't know what it was that was discussed between counsel. Well, did she ask questions about what he knew about the plea agreement? Or had he read the plea agreement? Had he signed the plea agreement? She did that, right? She did, but the difference here is he came into the courtroom not anticipating to plead guilty. And somewhere along the line in the courtroom, that changed. So that negates what took place. That may be, I'm not sure about that. I mean, was the plea agreement reduced to writing? Of course it was. Yes. Was the plea agreement submitted or conveyed to the defendant? My understandings are that they were. Was there a statement in open court by counsel and or the defendant that he had read the plea agreement? Yes. That he understood the plea agreement? Yes. Again, though, that gets to the question of the Rule 11 proceedings themselves. Under Laura requires a very strict scrutiny of the actual proceedings themselves. And to look very closely as to whether or not there are any deficiencies in the pleading in the courtroom itself. And those are the reasons why I ask that the court consider, in its decision in this case, setting forth for further use on plea provisions. And at the time that Rule 11 proceedings take place, that the specific questions that you would ask be included in that plea colloquy. Thank you. Good morning, and may it please the court. My name is Hagen Scotton. I'm an Assistant United States Attorney in the Southern District of New York. I represent the government here, and I also represent the government in the court below. Because the district court fully complied with Rule 11, and because the defendant's plea was knowing and voluntary, the judgment should be affirmed. I'll start briefly on the medical issue. I think largely for the reasons reflected in the colloquy, there was a full discussion of any medical issues and any issues with medication. What the court didn't ask, the type of medication, it didn't talk about in any specific way about the medication itself. Should it have? I don't think that's necessary, Your Honor. And in fact, in the cases cited by my adversary, for example, in Tien and in the case of the defendant, the defense attorney had actually spoken with the defendant's treating physician. And was able to give the district court assurances, both as to the medications effect and as to the fact that the defendant, although suffering from depression,  depression and anxiety, wasn't suffering from some more serious mental illness that would really cause perception problems. So having a defense attorney recite medicine names doesn't add anything, because neither courts nor lawyers or medical experts. I think it's actually far better here for the attorney to say, I spoke with this doctor. I have no concerns about his ability to perceive based on consulting with somebody who is a medical professional. So I think here the inquiry was entirely sufficient. Moving on briefly to the guidelines issue, just to sort of walk through that. I think the district court did say essentially all of the things that Mr. Nelson suggested should have. Starting at page 73 of the appendix, the district court says, by pleading guilty, you are exposing yourself to the possibility of receiving any combination of punishments up to the maximum that I'm about to describe. Six lines later, the district court says, the maximum term of imprisonment for count four, the county was pleading guilty to, is life. Do you understand that? Yes. Then moving on four pages to page 77, the district court reads rule 11B1M, almost verbatim, makes it a little more colloquial, to include a specific reference to saying, in which the district court said, she would determine a reasonable sentence for you based on the sentencing factors contained in a statute called 18 United States Code section 3553A. Do you understand all that? To which the defendant replied, yes ma'am. Don't see how that could be plain error. Then continuing on that same page, and I think your honor referred to this, the district court judge says both that nobody can predict your sentence and you may be surprised by it, only I'm going to determine your sentence. And further cautions the defendant, similar to your honor's inquiry, that you cannot withdraw your plea if you don't like your sentence. So he's clearly been told, you are not guaranteed to want a 121 sentence. You can get anything up to life and you won't be able to withdraw, that's a real possibility. Finally- What about your adversary's view in response to Judge Cabranes' questioning that with respect to the section 3553A factors, that there needed to be more discussion, more detail as to each of those factors? I don't believe that's a requirement, it's not in the rule. I'm not going to speak from experience, but I certainly, this is the checklist that judges use again and again. And I think it's permissible, as Judge Nathan did, to say, look, have you discussed this with your attorney?  There certainly is room for an attorney to explain things. And then to finish up, consistent with Judge Cabranes' inquiry, at page 79 of the appendix, you see that the district court did indeed ask, have you read the plea agreement? Have you reviewed it with your attorney? Do you understand it? And that is important, because the plea agreement also says that the office is not promising any sentence, and that the defendant is exposing himself to anything up to life imprisonment. The final point I wanted to make, Your Honors, I don't think it is a distinguishing fact that would make this case unique. Had Mr. DeSilva chosen to plead guilty on the day of, in the time before plea agreements were often reduced to writing, day of pleas were not uncommon, and this court affirmed many of them. Here, however, this appearance was scheduled as a change of plea hearing a week in advance. The plea agreement, as Judge Cabranes asked, was reduced to writing, and you can see the date on it, is a day in advance. So this is not a spontaneous decision to plead guilty. It is true that on the day of, apparently Mr. DeSilva had a second thought. The government filed a quick letter to Judge Nathan and said, do you want to postpone this? But when Mr. DeSilva showed up in court and had a chance to speak with his lawyer, he said, you know, I want to go forward with this plea I scheduled last week that was reduced to writing yesterday. So this is not a spontaneous or last minute decision, not that I think it would matter if it was. I'll rest on my briefs for the remainder of my points. Thank you, Your Honor. In rather brief response to the government's position, this case was indeed sui generis because of the procedural history. He had requested new counsel, he then stayed with counsel. He then requested new counsel again. He didn't want his plea, he wanted his plea. He didn't want his plea, he wanted his plea. He's of diminished capacity, while the government points to the fact that questions were raised concerning medication, and that the attorney indicated that he spoke with the doctor concerning his mental ability. The attorney very clearly states at page 866 that I do not know the specific dosages, or types of medication, or the panoply of all of the medications that he's taking. And that's- Is it required that they have a medical expert come in whenever there are medications involved in a plea agreement? In very few, but maybe in a case of this nature. And in this case, what difference would it have made if it was 40 milligrams or 60 milligrams? In terms of the outcome, because the main question here is, can he understand what's going on at the time? Nobody in the room would be capable of saying, my gosh, it's 60 milligrams. That causes a person to be unable to function. So, what difference would it have made just knowing either the name of the medication or the dosage? It's not the name of the dosage, it's the combination of them. When you're taking anti- It's not the name of the dosage. If you're taking antidepressant medication, anti-anxiety medication, and significant pain medication at the same time. Everybody knew that. Everybody knew that fact. And they relied upon counsel's statement that this is fine. And the defendant, who has changed his mind three times in the last four days. There's an error of view here, correct? I understand very clearly that Liz, and it's our position, that under the circumstances here, where the court failed to articulate the 3553 factors. That the court then relied upon for purposes of enhancing his sentence. Had that been done, then there was a reasonable probability that the defendant would have really thought closely about what he was doing. But that wasn't stated, rather what was stated, and I'm going to look at the 33 factors as well. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.